IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| J. Andrew McKamie, DDS, d/b/a | ) |
| Center for Exceptional Dentistry, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. |
| -vs- | ) CIV-13-173-C |
| | ) |
| PATTERSON DENTAL SUPPLY, INC., | ) |
| | ) |
| Defendant. | ) |

DEPOSITION OF J. ANDREW McKAMIE, DDS

TAKEN ON BEHALF OF THE DEFENDANT

ON SEPTEMBER 13, 2013

IN OKLAHOMA CITY, OKLAHOMA

* * * * * * * * * *

WORD FOR WORD REPORTING, L.L.C.
3250 CHASE BANK BUILDING
100 NORTH BROADWAY
OKLAHOMA CITY, OKLAHOMA 73102

Reported By:  Chrystal H. Vance, C.S.R.

```
 1              A P P E A R A N C E S

 2

 3      For the Plaintiff:

 4              Michael L. Loyd, Esq.
                ATTORNEY AT LAW
 5              3810 North Peniel
                Bethany, Oklahoma 73008
 6              Mloyd@mikeloyd.com

 7
        For the Defendant:
 8
                Robert A. Gust, Esq.
 9              BERNICK LIFSON
                5500 Wayzata Boulevard
10              The Colonnade Suite 1200
                Minneapolis, Minnesota 55415
11              Bgust@bernicklifson.com

12                      * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             T A B L E   O F   C O N T E N T S

2                                                PAGE

3    STIPULATIONS.............................4

4    DIRECT EXAMINATION BY MR. GUST.............5

5    JURAT....................................191

6    ERRATA SHEET.............................192

7    REPORTER'S CERTIFICATE....................193

8

9                 E X H I B I T S

10                                 PAGE

     Deposition Exhibit No.

11    1                             32

12    2                             44

13    3                             63

14    4                             70

15    5                             84

16    6                             94

17    7                             95

18    8                             99

19    9                             112

20    10                          121

21    11                          138

22    12                          163

23    13                          170

24    14                          181

25

```
 1              S T I P U L A T I O N S

 2

 3         It is hereby stipulated an dagreed by and

 4    between the parties hereto, through their

 5    respective attorneys, that the deposition of

 6         J. Andrew McKamie, DDS, may be taken on behalf

 7    of the Defendant on September 13, 2013 in

 8    Oklahoma City, Oklahoma by Chrystal H. Vance,

 9    Certified Shorthand Reporter for the State of

10    Oklahoma, pursuant to the Federal Rules of Civil

11    Procedure.

12

13                  * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q.    Okay.  So in 1982, you were about

2    25-years-old, something like that?

3    A.    Twenty-six, I believe.

4    Q.    And while you were in school, did you

5    have any significant employment, other than -- you

6    know, I'm not counting like being a waiter or

7    something to make money, but, you know, did you do

8    anything else or were you pretty much just a

9    student?

10   A.    Student.  But I refereed and umpired.

11   Q.    Okay.

12   A.    And worked in the summers.

13   Q.    So have you basically been a dentist now

14   for 31 years?

15   A.    That's correct.

16   Q.    When you started after dental school, did

17   you work for someone else or some other clinic?

18   A.    I did not.

19   Q.    So you immediately went into private

20   practice?

21   A.    I did.

22   Q.    Did you have a partner or anything in the

23   beginning or other associates?

24   A.    I did not.

25   Q.    When you started, were you the person who

1    signed the leases, signed the contracts, and did

2    all that stuff?

3        A.    That's correct.

4        Q.    Has that always been the case?  Have you

5    sort of always been the -- in addition to being

6    one of the practitioners, you've been sort of the

7    chief operating officer, if you will?

8        A.    That's correct.

9        Q.    When did you first start having

10   associates approximately?

11       A.    The first associate was Dr. Bill Kohs,

12   but I -- I'd have to say in the early 90's,

13   maybe.  That's a guess.  That's --

14       Q.    So prior to that time, it was just you

15   and maybe a hygienist or receptionist or something

16   like that?

17       A.    Correct.

18       Q.    And was Dr. Bill Kohs like a partner or

19   was he more of someone who worked for you?

20       A.    Worked for me.

21       Q.    At what time did you establish the name,

22   Center for Exceptional Dentistry?  Is that the

23   name in which you practice under?

24       A.    That's correct.

25       Q.    When was that established?

1     Q.    Had you had dealings with Patterson

2    Dental prior to the transaction that, you know,

3    we're going to be talking about today?   I mean,

4    had you been buying other supplies from them?

5     A.    For a number of years, they were my

6    primary supply company.

7     Q.    So --

8     A.    I couldn't tell you the years, but it was

9    for -- it was more than a couple.   It was a number

10    of years there that -- I forgot Emily's last name,

11    but she was my sales rep for Patterson's.

12     Q.    And so I'm going to start showing you

13    documents before long that start in 2007, the Fall

14    of 2007.   So as of the Fall of 2007, were you, at

15    that point, did you consider Patterson sort of

16    your regular supplier?

17     A.    I did not.

18     Q.    Okay.   What -- what was the period where

19    Patterson was the regular supplier?   Was it

20    sometime prior to that?

21     A.    It was prior to that, yes.

22     Q.    Okay.   And can you give me an

23    approximate?   It was the 80's?   It was in the

24    90's?   It was something else?

25     A.    I built my office in 1996 range there.

1    superstore.  Anything that a dentist might want,

2    they hopefully provide --

3              MR. LOYD:  I would object to the form

4    of the question as being leading.

5        Q.   (By Mr. Gust) Do you understand my

6    question?

7        A.   Can you repeat?

8        Q.   Sure.

9        A.   Either that or the one before and I'll

10   answer --

11       Q.   Yeah, no, it's -- so Patterson Dental is

12   basically -- just to be clear, they are -- they

13   don't manufacture their products as far as you

14   understand, correct?

15       A.   I see them as representing products,

16   selling sundries, mainly, but also products and

17   equipment of manufacturers.

18       Q.   Of other manufacturers?

19       A.   I would say, yes.

20       Q.   And is that the case with the CEREC

21   products?  And CEREC is C-E-R-E-C.

22       A.   Can you explain, "Is that the case as far

23   as" --

24       Q.   Well, so somebody else may actually

25   manufacture CEREC.  Patterson is just a sales

1    can't recall.

2        Q.    Would that meeting have been -- or that

3    class been relatively close in time to Fall of

4    2007?

5        A.    Definitely, yes.

6        Q.    Okay.  So then is that the -- sort of

7    your first introduction to CEREC?

8        A.    First detailed introduction to it, yes.

9    I was familiar with the technology, but not in

10   detail.  And that's why I attended.

11       Q.    Where was that meeting or presentation

12   held, if you remember?

13       A.    It was at Patterson's offices.  I

14   couldn't tell you the -- I believe, and not

15   certain, that it was once they moved up to the --

16   towards Edmond site.

17       Q.    How big of an event is that -- was that,

18   do you remember?  I mean, is it like an auditorium

19   full or is it, you know, five people around the

20   table or something else?

21       A.    Definitely not an auditorium full.  It's

22   doctors and maybe team members around a table, but

23   I would've said less than 20.  And that's just a

24   guess.  But that type of setting.

25       Q.    So is it fair to assume that that was in

1    2007?

2        A.    I believe it was, but I'm not certain.

3        Q.    What was your -- what's the next contact

4    you remember with Mr. Stephenson or anyone else at

5    Patterson regarding CEREC?

6        A.    I don't know if it was actually the next

7    -- the next contact I remember is an in-office

8    demonstration.

9        Q.    And that's in your office?

10       A.    Uh-huh.

11       Q.    That's a "yes?"

12       A.    Yes.

13       Q.    Do you recall who did that?

14       A.    I know Matt Stephenson was present.  I'm

15   not certain whether anyone else from Patterson was

16   present or not.  There could have been.

17       Q.    So how long does that process take, the

18   in-office demonstration?

19       A.    As far as how many hours it takes?

20       Q.    Right.

21       A.    Under two hours.  I don't know whether we

22   spent an hour or two, but maybe two hours I would

23   think.

24       Q.    At that point, that's before you commit

25   to buy anything.  That's just to bring it out to

1        A.    Yes.  On that acquisition, there is a

2   camera, also, that's on that.  And you do take --

3   you use that camera to take a picture of the

4   teeth.

5        Q.    And then the other, the milling unit, why

6   don't you tell me, for the record, what that

7   does.

8        A.    It actually takes the information, inputs

9   into that acquisition unit, and then fabricates,

10  out of a block of porcelain, a tooth or crown

11  that's to be put on a patient's actual tooth

12  that's needing a crown.

13       Q.    And that tooth that it -- it does, is

14  that a temporary or a permanent?

15       A.    A permanent.

16       Q.    So I just had these done.  I know it's

17  hard to get on the record.

18       A.    They look nice.  I will tell you that.

19  They look nice.

20       Q.    I think they actually -- they might even

21  be a little too white, but -- I had temporary and

22  then a permanent.  Is that the idea behind the

23  CEREC?  You just do it once rather than having to

24  have a temporary and a permanent?  Is that kind of

25  the draw of that?

1      A.   It's one of the draws, but many doctors

2   do it in two appointments like regular.

3      Q.   Even with the CEREC you mean?

4      A.   Yes.

5      Q.   What would be the reason for doing that?

6      A.   Time-saving, improving the quality

7   -- some will argue there's time-saving on the

8   other end of it.  But to be able to take your time

9   and mill it in the evenings or have someone else,

10  and then bring the patient back for a second

11  appointment to deliver.

12     Q.   In any event, you're still eliminating

13  sending it to a lab somewhere else, is that

14  correct?

15     A.   That's correct.

16     Q.   So this in-office demonstration, that was

17  like a follow-up or a result of the meeting you

18  went to?

19     A.   That's my recollection of it.

20     Q.   What was the next interaction you had

21  with Patterson or Mr. Stephenson?

22     A.   I remember there being a follow-up by

23  Matt about placing an order.  And it would have

24  been the next.

25     Q.   Do you recall if that was in person or by

1   the phone or something else?

2      A.   I don't recall.  I believe it was in

3   person.

4      Q.   Do you recall how that was resolved?  I

5   mean, did you decide to order it then or was there

6   -- was this part of a longer process?

7      A.   I actually declined to order then and

8   wanted to wait until after the first of the year.

9      Q.   Was that just kind of a cash-flow issue

10  or something else that you wanted to wait until

11  after the first of the year?

12     A.   I'm not certain if it was a cash-flow

13  issue.  Just wanted to wait until after the first

14  of the year to order.  Sit on the idea and see how

15  it incorporated.

16     Q.   So after the first of the year, would

17  have been in the beginning of 2008?

18     A.   That's correct.

19     Q.   So what was the next meeting you had with

20  Mr. Stephenson or someone else from Patterson?

21     A.   The next meeting was over the phone with

22  Steve Hipson, the branch manager.

23     Q.   What -- do you -- who called whom in

24  that?

25     A.   Mr. Hipson called me is my recollection.

1     Q.   What was the substance of that

2   communication?

3     A.   It was that he had already ordered my

4   CEREC.

5     Q.   What was his explanation for why he had

6   done that?

7     A.   Out of expectations that I was going to

8   purchase the CEREC.

9     Q.   All right.  He wasn't telling you that he

10  felt you were contractually committed to buying

11  it.  Just that he -- he was so sure you were going

12  to want it that he was ordering so it would be

13  ready when you did?

14     A.   That's correct.

15     Q.   Okay.  So what did you say to that?

16     A.   I said I wanted to wait until after the

17  first of the year.

18     Q.   Okay.  And what was his response?

19     A.   He really just wouldn't take "no" for an

20  answer.

21     Q.   And so did that mean on that phone call

22  he got a "yes" for an answer?

23     A.   He informed me that they were just trying

24  to do me a favor is what I recall.  And that to

25  get my machine ready here.  He also let me know

1    that they would have to pay taxes on unsold

2    equipment.  It would cost them, what I believed he

3    said, was thousands of dollars.  And that he just,

4    as I said, wouldn't take "no" for -- and it was

5    just heavy pressure.  And I caved under the 100

6    percent guarantee, pretty much.

7        Q.    So that was during that phone call is

8    when you said you would go ahead and do it?

9        A.    I believe it was.

10       Q.    Okay.  As you sit here now, do you

11   remember the month or the date?

12       A.    I don't.  I mean, I do know it was before

13   the 2008 turned around, so it had to have been in

14   the last couple of months of 2007.

15       Q.    So as a result of your telephone

16   conversation, did you, then, execute documents?

17       A.    Some time after that, yes.

18       Q.    Do you remember how long after that?

19       A.    I don't remember how long, but I wouldn't

20   have thought it would have been a long period of

21   time.

22       Q.    During that discussion or your prior

23   discussions with Mr. Stephenson, had there been

24   discussions about financing?

25       A.    Not that I recall.

1  things, just up until this point that we've gotten

2  to chronologically.

3      A.   And can you tell me what this point

4  exactly that we're talking about here?

5      Q.   Well, it's the phone call with Steve

6  Hipson.

7      A.   Phone call with Steve Hipson?  I can't

8  recall whether when Matt was doing his follow-up,

9  whether he discussed that, but my recollection

10  would be, no.  And it would be afterwards.

11      Q.   Okay.  And so from what I understand, I

12  want to make sure I understand what you're saying,

13  during this phone call you basically gave in and

14  said, okay, I will buy it.  And then the paperwork

15  came afterwards?  That's your recollection?

16      A.   That's my -- my recollection along with

17  the guarantee that was brought in, like almost a

18  no-lose situation.

19      Q.   Okay.  But from what -- from what I've

20  understood from your testimony was you signed

21  documents after this phone call.

22      A.   That's my recollection.

23      Q.   All right.  Let me -- let me show you a

24  document and see if we can get some timeframe on

25  some of this.  I'm not trying to test your memory

1    trust my -- the person I'm working with and may

2    scan it, but I don't research it and read it in

3    detail, no.

4         Q.   Understood.  Let me ask you, on the page

5    where your signature is, on the second page, at

6    the top, the top paragraph -- and I'm not sure --

7    I think that this copy had been two-hole punched,

8    so there's a little bit of a gap, but I think I

9    can read it.  So I'm going to read it into the

10   record.

11        "CEREC Return Policy.  In the event of

12   return, the purchaser will be responsible for the

13   cost of basic training and installation kit valued

14   at $4,000.  Additionally, purchaser will be

15   responsible for the depreciation of the equipment

16   calculated at 2 percent of the original purchase

17   price per month."

18        All right.  Now, as I said, there's some

19   gaps where there's a two-hole punch, but do you --

20   first of all, did that seem to be an accurate

21   reading of that?

22        A.   Of what you just read to me?

23        Q.   Yes.

24        A.   That seems like an accurate reading.

25        Q.   Do you recall ever reading that language

1   on any document in connection with this case?

2        A.   I do not.

3        Q.   Do you recall ever discussing that

4   Patterson policy with anybody?

5        A.   I do not.

6        Q.   Do you recall what Patterson's return

7   policy was with respect to other equipment during

8   -- either at this time or back in the 90's when

9   they provided all your supplies?

10       A.   I do not.

11       Q.   Is it typical with your -- strike that.

12            Are you still using the same supplier

13   that you identified before that you started using

14   after Patterson?  The --

15       A.   For the sundries and equipment?

16       Q.   Yeah.

17       A.   Yeah, for the most part.

18   Sullivan-Schein.

19       Q.   And -- but did they also sell equipment?

20       A.   They do.

21       Q.   Have you bought any equipment from them?

22       A.   Maybe small pieces of equipment.  Nothing

23   major.

24       Q.   Is there a typical practice with respect

25   to dental equipment in terms of the return, just

1   question.

2              THE WITNESS:  Can you ask it a

3   different way or something?

4      Q.   (By Mr. Gust) Well, earlier you had

5   testified that you didn't want to buy this until

6   after the first of the year.  And my only question

7   was, is -- was that 90-day skip, was that

8   something that was thrown in for your benefit,

9   because the result would be you wouldn't have

10  payments until after the first of the year?  Or do

11  you believe that that 90-day skip was part of the

12  standard satisfaction guarantee offered to

13  everybody?

14     A.   I would have thought that would have been

15  the standard.

16     Q.   Okay.  As of the time that you got this

17  letter, had you had any other discussions with

18  Stephenson or anyone else at Patterson about what

19  the terms of Patterson financing were in terms of

20  the months -- you know, how many months it would

21  be, what the rates would be or anything like that?

22     A.   The only thing I recall is Matt

23  Stephenson offering me two monthly payments.  One

24  almost half of what the other one was for me to

25  choose from.

1    Q.   And do you recall the timing of when you

2  had those discussions?  In other words -- and if

3  you don't -- I mean, I realize this was a long

4  time ago.

5         Do you recall whether those discussions

6  were before or after you got this letter?

7    A.   I don't recall.  I would have expected it

8  after this letter, but I don't recall that.

9    Q.   Do you recall how Mr. Stephenson

10  communicated to you the two different payments?

11  Was it e-mail, phone call, in person or something

12  else?

13    A.   My recollection was in person.

14    Q.   And so of the two payments, was -- were

15  they with two different financing companies?

16    A.   I wasn't aware of that.

17    Q.   Well, at some point, and we'll get to the

18  documents, you financed with Bank of America.

19  There -- there's -- you actually -- documents with

20  Bank of America, correct?

21    A.   Now, say that part again.

22    Q.   At some point -- and we'll get to the

23  documents.  But at some point you executed

24  financing agreements with Bank of America,

25  correct?

1    Q.   Would that have still been in the Fall of

2    2007?

3    A.   I don't know.  I believed it to be after

4    the first of the year, but I'm not certain.

5    Q.   So was it possible for you to start using

6    the product before you went to basic training?

7    A.   Yes, I did use the product before that.

8    Q.   Okay.  Now No. 4 is, "Perform 40 to 50

9    restorations in the mouth."  Again, you've

10   produced some documents.  I believe they indicate

11   that you did use it about 160 times.  Does that

12   sound about right?

13   A.   Roughly, yeah.  I thought it was just

14   under 150, but it could have been 160.

15   Q.   Okay.  Well, the documents --

16   A.   That's right.

17   Q.   -- speak for itself.

18   A.   Yeah.

19   Q.   What is the rate on average?  You know,

20   how many of these typically do you do in a month?

21   Is it -- I mean, I think you used it for 15 or 16

22   months according to your Discovery, and you've got

23   150 or 160, so is that on average about 10 a

24   month, typically?

25   A.   You would think if you broke that down

1    average-wise, it would -- some were small, some

2    were -- in the month of January of 2008, I

3    believe, was the last time it was turned on for my

4    practice.  And I did two crowns that month.  So if

5    you want to say an average, and divide that up in

6    my head, but maybe 14 months divided by 150 would

7    be close to 10, little over 10, yes.

8        Q.   And this product is -- you've used it on

9    all teeth.  You use it on molars.  Use it on front

10   teeth, is that right?

11       A.   Most dentists, maybe only until recently,

12   feel confident enough using it on the front

13   teeth.  Most of the time it was molars and

14   premolars.

15       Q.   All right.  Did you attend the advanced

16   training?

17       A.   I did not.

18       Q.   Was there a reason for that?

19       A.   My practice was going through quite a bit

20   of transition at the time.  And so thought it was

21   probably finding the time to get away for advanced

22   training.

23       Q.   Did you have an understanding as to what

24   the normal timing was for advanced training?  In

25   other words, did they usually try to do that

1  before, you know, you had done a certain number of

2  -- or was it wide open as far as you know?

3      A.   My understanding would have been it's

4  wide open.

5      Q.   And so did you feel as though you didn't

6  need the advanced training?  I mean, I understand

7  you were busy, but did you -- what was your

8  feeling on whether or not you might learn more

9  things if you went to advanced training?

10      A.   Like I said, I think it was more the time

11  committment and finding a time to be able to

12  attend.

13      Q.   The sixth item says, "Make all of your

14  monthly payments on time."  Did you ever have a

15  monthly payment that was due to Patterson

16  Financial?

17      A.   That, I do not know.

18      Q.   Do you recall signing documents with

19  Patterson Financial to finance with Patterson?

20      A.   I don't -- I don't know if that was the

21  initial one, if I signed to purchase.  I never

22  made a payment.  It may have been the 90-day skip,

23  if I had something like that, and then Bank of

24  America took over, maybe.  I'm not sure.

25      Q.   Okay.  Well, that was my -- my

1    five minutes.

2                    (A brief recess was taken, after

3                    which the following proceedings were

4                    had:)

5        Q.    (By Mr. Gust) We're looking at Exhibit

6    2.   I believe you indicated you had some

7    discussions with Mr. Stephenson about, basically,

8    the 100 percent satisfaction guarantee.   Is there

9    anything about those discussions that you remember

10   is any different from what's in here or does this

11   more or less incorporate what you recall him

12   saying about it?

13       A.    Nothing really different.   And we just

14   kept referring to it as the 100 percent

15   satisfaction guarantee.

16       Q.    And did you have that discussion with

17   Mr. Hipson as well?   Did he use that term?

18       A.    I believe he did.

19       Q.    And do you believe that prior to the time

20   that you signed this that someone had sort of

21   orally told you that, well, here's the terms or

22   something like that or -- and, again, if you don't

23   remember, that --

24       A.    No.

25       Q.    -- that's a fine answer.

1          MR. LOYD:  Objection.  That's not

2    what he testified to.  He testified he didn't know

3    when it was signed.

4          Q.   (By Mr. Gust) Well, I understand that you

5    don't know the date that it was signed, but

6    relative to when this Exhibit 2 was signed, do you

7    have a recollection as to whether or not those

8    were close together in time regardless of when it

9    was?

10          A.   Is close together a couple of weeks apart

11    or something like that?  I -- I don't -- I don't

12    know.

13          Q.   Well, actually, this close together.

14    Within -- I mean, these appear to have been signed

15    within three days of each other.  And that's all

16    I'm wondering.  And if you have no recollection,

17    that's fine.

18          A.   Yeah, I don't.  I don't.

19          Q.   If you look at No. 4 on the first page

20    under Delivery and Acceptance of Property, it

21    says, "The property has been delivered by seller

22    to buyer's address set forth above unless

23    otherwise noted."  And I don't see anything

24    otherwise noted, so I'm wondering, as of the time

25    that you signed this, do you recall, had the

1  equipment been delivered?

2      A.   I could probably look at the date of my

3  first crown that I put out and tell that, but I

4  don't -- I don't know exactly.

5      Q.   Okay.  Well, maybe we'll -- when we get

6  down to that.

7      A.   Yeah.

8      Q.   So you think that when it was delivered,

9  you used it almost instantly?

10     A.   I would think that within a few days,

11  yes.

12     Q.   Okay.  And this also -- a little bit

13  above where I just asked you to read it says, "63

14  consecutive monthly payments."  Do you see that?

15     A.   I see that, yes.

16     Q.   And so this -- under the original

17  financing agreement signed with Patterson Dental,

18  that provided for 63 monthly payments with a

19  three-month skip, is that right?

20     A.   That's what that says there, yes.

21     Q.   Well, is that different from your

22  recollection?  I mean, I know you -- there's

23  another financing that occurred, but with respect

24  to this document, is that your understanding of

25  what it was going to be?  63 months?

1      A.    That's correct.

2      Q.    And so -- and is it one crown per block?

3      A.    That's correct.

4      Q.    So assuming they work out all right, that

5  allows you to basically make 45 crowns -- well, it

6  allows you to make 45 crowns.  You may not end up

7  using all of them, but it allows you to make 45

8  crowns, is that right?

9      A.    That's correct.

10      Q.    So back to Exhibit 4.  I see there is an

11  entry on the first page, "Marianne," somebody,

12  "October 25, 2007."  Do you see that?

13      A.    I do.

14      Q.    So does that indicate that as of October

15  25th, anyway, you must have had the equipment?

16      A.    That would be my understanding.

17      Q.    And in glancing quickly through here, the

18  rest of the dates appear to be '08 or '09, but --

19  so I believe -- so Exhibit 3 was executed -- or

20  had a date on the top -- I'm sorry.  It doesn't

21  have a date -- the signature -- it has a date on

22  the top of October 25th, 2007.

23          I had asked you if the equipment was in

24  place at the time you signed that.  And you said

25  you'd have to look at your patient records.  Is

1    And so about the time you take up -- and add some

2    staining to it and everything, it can be a couple

3    of hours.

4         Q.   And by "learning curve is pretty steep,"

5    I'm not sure what you mean.  Do you mean that

6    after you've done it long enough, you have to do

7    it a really long time before you get proficient at

8    it?

9         A.   If you're conscientious and you're -- I

10   mean, you can do something for a long time without

11   conscientiously -- and not get any better at it.

12   But, yes, to get good at that, I believe it takes

13   a long time.   It's a pretty good size learning

14   curve.

15        Q.   And did you feel that you had gotten to

16   the top of the learning curve?

17        A.   No.

18        Q.   And, theoretically, if you are at the

19   point where you can do this in one visit instead

20   of two -- I know you testified that sometimes you

21   still did it in two visits, a temporary and

22   permanent.  But if you get to that point, you've

23   eliminated, basically, an hour or two of chair

24   time, haven't you?

25        A.   It's possible.  The -- they change their

1    "Sorry for the delay.  We've been out of control?"

2         A.    I do not know.

3         Q.    This document -- so this is your office's

4    fax coversheet and this is a fax cover sent to

5    Bank of America.  Is that your understanding as

6    well?

7         A.    That's my understanding, yes.

8         Q.    Now, the documents appear to be Bank of

9    America documents.  You know, they have Bank of

10   America heading or something on it.  Is that your

11   understanding as well?

12        A.    Yes, that's my understanding.

13        Q.    Do you have any recollection of how the

14   Bank of America documents came to you?  And by

15   "you," I mean Center for Exceptional Dentistry in

16   general?

17        A.    How they came to me?

18        Q.    Yeah.  I mean, were they e-mailed?  Were

19   they faxed?  Were they regular mail?

20        A.    I have -- I have no idea on that part.

21        Q.    Okay.  Do you -- and it is the case,

22   prior to this time, were you familiar with Bank of

23   America?

24        A.    I mean, I know of it as -- yeah, they're

25   Bank of America.  I'm familiar with the name.

1    Q.   Okay.

2    A.   And --

3    Q.   But you knew that Bank of America and

4  Patterson were separate companies, correct?

5    A.   I thought they had a dental division and

6  everything, so I thought I was financing through

7  the same thing is my recollection.  I wasn't

8  thinking I was -- I just went for the lower

9  payment.  And, evidently, that was the Bank of

10 America --

11   Q.   Okay.

12   A.   -- dental division.

13   Q.   Okay.  So you thought that Bank of

14 America had a dental division?  Is that what

15 you're saying?

16   A.   I just figured it was part of the

17 Patterson's financing is what I'm saying.

18   Q.   I'm not sure what you mean by "part of

19 Patterson's financing."

20   A.   Well, I was offered the two payments with

21 that guarantee was my belief in that.  And so I

22 expected it was still part of Patterson's

23 financing program.

24   Q.   So your belief was that Bank of America

25 was part of Patterson?

1    A.   I thought they were part of Patterson's

2    financing program.

3    Q.   Okay.  So that they were -- I want to

4    make sure I understand what you mean by that.  So

5    let me ask this question, which I think I asked

6    originally:  You understood that they were

7    separate companies, correct?

8    A.   Yes.  I don't believe Bank of America and

9    Patterson is the same company.

10    Q.   But your testimony is that you thought

11    that they had some sort of a built-in arrangement

12    that Bank of America had -- it was like the Bank

13    of America program offered by Patterson type of a

14    thing?

15    A.   Right.

16    Q.   Sort of like when you book an airline

17    ticket they try to get you into a hotel because

18    there's some sort of connection?  That kind of

19    thing?

20            MR. LOYD:  Objection to the form.

21            THE WITNESS:  I don't understand that

22    part.  I just know Matt offered me two different

23    payments --

24    Q.   (By Mr. Gust) Did you have --

25    A.   -- at the time of purchase.  And I took

1    think it's 33,995.  All right.

2              So, again, this isn't a document that,

3    you know, you prepared or you've seen before.  But

4    does that -- do you recall someone from your

5    office, you or someone from your office, making an

6    inquiry about trade-in value?  Trade-in date?

7         A.   I don't recall that at all.

8         Q.   Do you recall -- as I recall, you -- you

9    said you used this for -- just barely into

10   2009, is that correct?

11        A.   No.

12        Q.   Used it for --

13        A.   Barely into 2008.

14        Q.   Well --

15        A.   I'm sorry, I'm sorry.  You're correct.  I

16   bought it at end of 2007.  Barely into 2009.

17   That's correct.

18        Q.   Okay.  And then I believe in some of your

19   Discovery responses that we had been looking at

20   later, that you indicated at some time after you

21   stopped using it you made some sort of inquiry

22   about the satisfaction guarantee, the 100 percent

23   satisfaction guarantee.  Do you recall

24   approximately when that was?

25             Particularly in relation to -- okay.  We

1    know the date you stopped using it because of your

2    records.  So that's early 2009.

3         A.   Okay.

4         Q.   Do you have a recollection as to when

5    that would have been?

6         A.   I would have thought it would have been

7    the first half of 2009.

8         Q.   Okay.  Well, and that's why I was

9    wondering whether or not one of these entries

10   might have related to that.  They don't mention

11   the 100 percent satisfaction guarantee, but there

12   is some sort of question in here about, you know,

13   the warranty and/or the trade-in amount, so -- but

14   you don't have any recollection of what's listed

15   in this document, Exhibit 8, is that correct?

16        A.   I don't, no.

17        Q.   What were the circumstances that you

18   talked to Matt Stephenson in this timeframe?

19        A.   I contacted Matt Stephenson just to

20   discuss my options from here with my CEREC.  And

21   he's the one that actually volunteered the

22   information like -- and he -- there was no -- we

23   had no time limit placed on that.

24        Q.   What was the timing of that -- I mean,

25   was that after you'd stopped using the product?

1      A.    It was after I'd stopped using the

2   product.

3      Q.    And was it shortly after?  I mean, was it

4   Winter of 2009?

5      A.    I would still guess it's in the first

6   half of 2009.

7      Q.    Did you call him up or run into him

8   somewhere?

9      A.    I called him up.

10      Q.    Was he still working at Patterson?

11      A.    He was not.

12      Q.    How did you locate him?

13      A.    Actually, had his cell phone number.  He

14   was -- he gave -- I figured he gave that to all of

15   his clients in case we had anything that we

16   needed.

17      Q.    Oh, so you had his cell from when he did

18   work at Patterson?

19      A.    That's correct.  And called him thinking

20   he still worked there.

21      Q.    At the time you stopped using the

22   machine, was there -- had you been sort of tailing

23   off using it and then just stopped or had you just

24   made a decision as of today I'm not going to use

25   it anymore?  Was it kind of a cliff like that?

1    A.   Mainly -- and Matt ended up just

2  indicating there just wasn't a time limit placed

3  upon that.

4    Q.   So what -- do you remember specifically

5  words that you said or words that he said or is

6  your recollection just in general what he

7  communicated?

8    A.   I remember pretty specifically that he

9  said that -- because, like I said, he offered up

10 that information.  He said, "Andy, when I sold

11 that to you, there wasn't a time limit placed on

12 it."  And he went on to say that, "Sirona is a

13 good company."  He said, they'll -- "They like to

14 make their doctors happy.  You know, follow

15 through with that and give you your money back."

16   Q.   And Sirona is what he said?

17   A.   Sirona.

18   Q.   And who is that?  Is that who makes the

19 CEREC?

20   A.   That is the original manufacturer.

21   Q.   Okay.  So what he was telling you is that

22 Sirona would give you your money back?

23   A.   He said Sirona was a good company and the

24 agreement that we had had no time limit on it.

25 And that I would receive my money back.

1    Q.   So -- and by "your money back," what --
2  what did that mean to you?  What were you going to
3  get back?
4    A.   The way he claimed it there, it was like
5  the money that I spent to purchase the -- the
6  whole unit there.
7    Q.   So you'd get all your money back?
8    A.   That's what I was expecting after that
9  conversation.
10    Q.   So your interpretation from that
11  discussion with Mr. Stephenson was that you could
12  use this machine as long as you wanted.  You could
13  make as much money off it from billing your
14  patients and then you could just turn it back and
15  get all of your money back?
16    A.   I thought that's what that guarantee was
17  about.
18    Q.   Okay.  Is that what you thought it was
19  when you signed it or is that what you thought it
20  was when you had this discussion with Matt
21  Stephenson?
22         MR. LOYD:  Object to the form of the
23  question.
24         THE WITNESS:  I don't know.  I
25  thought when I -- when I signed it there, I just

1   though I had a no-lose situation like they

2   presented to me.  And when I went ahead and

3   accepted the unit, that I would get to try it and

4   receive my money back if I didn't like it.

5        Q.   (By Mr. Gust) And -- but no matter when

6   you didn't like it?

7        A.   Yeah, there wasn't a time limit on it.

8        Q.   Okay.  So your understanding of the

9   agreement as of the time you signed it was that

10  you could use this for as long as you wanted, make

11  as much money off it as you could, and then just

12  turn it over and get all your money back?

13            I'm sorry, is that a "yes?"

14       A.   That -- that was my understanding on it,

15  that I could use -- I didn't -- I didn't have any

16  other thing to believe on that.

17       Q.   Okay.  And so when you had this

18  discussion, this later discussion with

19  Mr. Stephenson, he said basically the same thing

20  as what your original understanding had been?

21       A.   That's what he said.

22       Q.   Do you remember anything else that he

23  said?

24       A.   I don't remember anything else.

25       Q.   I believe from looking at the other

1    documents, that you, then, contacted somebody else

2    at Patterson in Oklahoma City, is that correct?

3        A.    Uh-huh.

4        Q.    That's a "yes?"

5        A.    Yes.  I'm sorry, yeah.

6        Q.    Did you recall who that person was?

7        A.    I believe it was the person that took

8    Matt's place.  And Brian, I don't know his last

9    name.  Brian.

10       Q.    So he was basically the sales rep?

11       A.    I'm not sure his title.

12       Q.    Okay.  Well, do you know what Matt's

13   title was?

14       A.    No.  I figured he was sales rep.

15       Q.    Okay.

16       A.    And so if --

17       Q.    So the person that you spoke to, did you

18   speak to them on the phone or otherwise?

19       A.    I believe on the phone.  I'm not certain.

20       Q.    What do you -- and that occurred in this

21   sort of same timeframe right after you talked to

22   Matt?

23       A.    Close in that timeframe, I believe.

24       Q.    Okay.  And so just to make sure I

25   understand, you stopped using it in January of

1   2009, but you might have waited as many as six

2   months before you called Matt Stephenson?

3       A.   I don't know how many months in between

4   there.

5       Q.   Okay.  Well, you said it was the first

6   half of 2009.

7       A.   Yeah.

8       Q.   You said that a couple times.  And that's

9   fine.

10      A.   Yeah.

11      Q.   I'm just trying to figure out why you

12  would have waited six -- why would you even wait

13  six months?

14      A.   Yeah.  I don't know if it was the back

15  half.  I just know it was in the first half of

16  that.  And I would have thought it probably would

17  have been midway in between there, but I do not

18  know that.

19      Q.   So what do you recall the person at

20  Patterson saying when you called about the

21  satisfaction guarantee?

22      A.   That he said I could not return it.

23      Q.   And do you recall specific words or just

24  remember sort of the content, the general --

25      A.   You know, I don't remember if those were

1    any discussion about it having trade-in value or

2    it having a depreciated value or anything else?

3        A.    No discussion that I recall.

4        Q.    So, at that point in time, did you take

5    any other action?  Explore any other options as to

6    what to do with the equipment?

7        A.    Not at that point in time.  I just --

8        Q.    Prior to initiating this litigation, did

9    you do anything else in terms of, you know, trying

10   to sell it or license it to somebody or anything?

11       A.    No.

12       Q.    So you just -- you continued to make your

13   monthly payments to Bank of America, correct?

14       A.    That's correct.

15       Q.    And there's about, what, four years left

16   on that?

17       A.    If I purchased it in --

18             MR. LOYD:  Documents speaks for

19   itself, Counsel.

20             THE WITNESS:  Yeah, I'm not sure.  I

21   was trying to do the math, but --

22             (Deposition Exhibit No. 9 marked for

23             identification.)

24       Q.    (By Mr. Gust) I show you what we've

25   marked as Exhibit 9.  Ask you if you recognize

1      A.   Yes, that's true.

2      Q.   Did you -- have you purchased one of the

3   competitor's products?

4      A.   I have not.

5      Q.   How is it -- when did you come into

6   possession of this?  Was this when they were

7   trying to sell it to you or some other time?

8      A.   I'd inquired of that, but I was voicing

9   just the disappointment in the upgrades and the

10   true cost of staying up with CEREC.  And so when

11   they -- when my reps told some of those figures, I

12   said, "Oh, I'd like to see something like that"

13   and if would save me some research on that, so --

14      Q.   So can you give me a timeframe of when

15   you had that discussion?  Was it part of this

16   litigation or was it four years ago when you

17   stopped using it or something else?

18      A.   I doubt it was four years ago because the

19   OmniCAM came out in 2012.  So I don't recall when.

20      Q.   So was that part of your dissatisfaction

21   with this CEREC, was that the -- the cost of the

22   upgrades?

23      A.   The number one thing was the quality of

24   the fit for me.  And we just have had a reputation

25   of excellence in the area of crown and bridge.  We

1   focus highly on that.  And quality of fit is the

2   major concern.  So quality was part of the

3   dissatisfaction, but this played a part of also.

4   I was told in the beginning that upgrades would be

5   minimal to stay up with the current technology

6   with CEREC.

7          THE WITNESS:  Can I run to the

8   bathroom real quick?

9          MR. GUST:  You sure can.

10          (Abrief recess was taken, after which

11          the following proceedings were had:)

12   Q.  (By Mr. Gust) You had said just before

13   the break something about what you'd been told

14   about upgrade costs.  What do you remember?  Who

15   do you remember spoke to you about what the CEREC

16   upgrade costs were going to be?

17   A.  I just remember Matt discussing that.

18   That one of the benefits and what CEREC was doing

19   that upgrades would be minimal to stay up with the

20   times.

21   Q.  And was there any sort of specific

22   representation as to what the upgrades had been in

23   the past?

24   A.  No, not that I recall.

25   Q.  And do you recall -- did he tell you that

1    Q.   And do you have any sense, you know, from

2    your -- either what you read or talking to other

3    dentists or whatnot, what other people's

4    experience with the CEREC?  Or is your just -- you

5    just base it on your own experience?

6    A.   No, you hear, you know, through the

7    grapevine if other people have owned them or not.

8    And so I think that would be interesting

9    information for research to see the satisfaction

10   with --

11   Q.   And have you researched that?  Have you

12   found out the satisfaction levels of other

13   dentists?

14   A.   I've inquired a little bit, not

15   extensively.

16   Q.   What have you found?

17   A.   I found that there's -- that it goes both

18   ways.  There's a number that are dissatisfied and

19   some that returned theirs; and some that use them

20   both for front teeth and back teeth with the new

21   generation.

22   Q.   Do you know of anyone in particular that

23   has had a CEREC that they've returned?

24   A.   I had heard of Scott Waugh that returned

25   his.

1    A.   I wanted to keep it current.  And that

2    would be a -- you know, a reason for, hey, we've

3    maintained this well, but I'm ready to return to

4    it.  Because Matt had confirmed to me that that

5    was the agreement.  It had no time limit on it.

6    Q.   I understand that.  But after that,

7    someone who actually worked at Patterson at the

8    time told you the opposite, didn't they?

9    A.   He did.  But, in my opinion, my agreement

10   was with Matt.  And Brian didn't know the

11   particulars of -- of how I was going to wait -- he

12   ordered it for me anticipating that I would do

13   it.  And then I had nothing to lose with the --

14   with the guarantee.  So I didn't expect Brian to

15   relate to that, but --

16   Q.   So it was your position that you could

17   just wait as long as you want and then decide to

18   return it?

19   A.   Yeah.  We were in some big transition at

20   the office.  And so I had a lot on my plate in

21   dealing with -- with the office during those

22   years --

23   Q.   Well, but every month you were paying out

24   -- what's your payment to Bank of America?

25   A.   Maybe 1,300, 1,400.  I don't know, 12 to

 1   14, somewhere.

 2       Q.   And then you're making a payment to the

 3   CEREC Club?

 4       A.   That's correct.

 5       Q.   So every month you were paying out

 6   $1,500 --

 7       A.   That's correct.

 8       Q.   -- approximately?

 9            Was there something -- was there some

10   reason that after three years, approximately, that

11   you, then, decided to do something?

12       A.   You know, like I said, we had a lot going

13   on in the practice.  The loss of two associates.

14   We were a three-doctor practice.  I had two

15   associates at the time.  And so we were going

16   through a whole lot of transition over a period of

17   time, just protecting the practice, for one, with

18   the letters of solicitation, protecting jobs.

19            And so part of that off and on throughout

20   that time period, I searched for my contract.  And

21   my wife is really usually pretty good about having

22   those all in one place.  And I was cleaning out my

23   upstairs and found my contract with some of the

24   owner's manuals.  And so when I saw that, I asked

25   Mr. Loyd to take a peek at it and review it with

1    Q.    Okay.  So -- and is there a time of year

2    when the upgrades come out or is that variable?

3    A.    Not to my knowledge.  I would think it

4    would be variable.  But Patterson and Sirona might

5    have -- they might like an early-in-the-year

6    launch.

7    Q.    Well, had the upgrade come out prior to

8    the time you stopped using the CEREC machine?

9    A.    In my recollection, no, it had not.

10   Q.    So you -- you stopped using in 2009 and

11   then there was an update that became available?

12   A.    After that, is what my recollection is.

13   Q.    Okay.  So at the time you stopped using

14   it, how would you have known how much it was going

15   to cost for the upgrade?

16   A.    I didn't.  I think that might be one of

17   our inquiries, you know -- you know, for that.  It

18   showed on the Patterson's thing that you said that

19   I wouldn't be aware of that piece of paper.  So we

20   probably just inquired after we heard it was -- it

21   was out.

22   Q.    Okay.  Because you had stopped using it,

23   but maybe you'd start?

24   A.    No -- well, if -- if an upgrade would

25   have improved the quality, I might have revisited

1     Q.   And when you said, "set up the

2   situation," do you know -- I mean, can you tell me

3   what he did?

4     A.   I can't tell you whether he had, you

5   know, contact information.  I don't remember.

6     Q.   So you don't remember him providing you

7   with bank documents -- or, I mean, he didn't have

8   a stack of Bank of America forms in his briefcase

9   or something, did he?  Or did he --

10    A.   I don't recall that, no.

11    Q.   A little further down in this paragraph

12  it says -- I'm in the fourth line starting in the

13  middle, "Plaintiff believes Bank of America paid

14  proceeds of the express loan directly to the

15  defendant."  Do you see that?

16    A.   I do.

17    Q.   So your understanding is that Patterson

18  was paid off by Bank of America and -- is that

19  correct?

20    A.   If that's the initial -- according to

21  that earlier document we looked at, if the 90-day

22  went through the other -- through Patterson, that

23  this paid that off, yes.

24    Q.   So as far as you know, Patterson isn't

25  owed anything at this time with respect to the

1    loan by you?

2        A.   I wouldn't expect with my balance being

3    all Bank of America.

4        Q.   Did you ever get a document from

5    Patterson showing, you know, the, sort of, closing

6    out -- the first -- the 63-month document?

7        A.   Not that I recall or -- or remember

8    receiving.

9        Q.   Then it says, "Other than the signing of

10   the documents to Bank of America, this loan was

11   procured and handled by the Defendant."  Do you

12   see that?

13       A.   Uh-huh.

14       Q.   That's a "yes?"

15       A.   Yes.  Sorry about that.

16       Q.   Can you tell me what it was that

17   Patterson did that you referred to as "procured

18   and handled."

19       A.   I guess it was just offered to me and

20   then set up the arrangements through the dental

21   division at Bank of America was my understanding.

22       Q.   Do you remember, though, how -- what the

23   contact was?  I understand you've told me that

24   Mr. Stephenson advised you that you could do this

25   payment or this payment.  But what I'm wondering

```
 1              C E R T I F I C A T E

 2

 3      STATE OF OKLAHOMA                    )

 4                                           )SS:

 5      COUNTY OF OKLAHOMA                   )

 6

 7            I, Chrystal H. Vance, a certified

 8      shorthand reporter within and for the State of

 9      Oklahoma, certify that J. ANDREW McKAMIE, DDS, was

10      sworn to testify the truth; that the deposition

11      was taken by me in stenotype and thereafter

12      transcribed by computer and is a true and correct

13      transcript of the testimony of the witness; that

14      the deposition was taken on September 13, 2013 at

15      9:04 a.m. at 100 North Broadway, Oklahoma City,

16      Oklahoma; that I am not an attorney for or a

17      relative of either party, or otherwise interested

18      in this action.

19            Witness my hand and seal of office on

20      October 3, 2013.

21

22                          _____

23                          Chrystal H. Vance, CSR

24                          For the State of Oklahoma

25                          CSR #1819
```